IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| FRANCIS INIEKPO, d/b/a<br>FEMA GROUP, | §<br>§<br>§ | |
| *Plaintiff*, | §<br>§ | |
| v. | § | Civil Action No.  SA-07-CV-879-XR |
| | § | |
| AVSTAR INTERNATIONAL<br>CORPORATION | §<br>§<br>§ | |
| *Defendant*. | §<br>§ | |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

Plaintiff Francis Iniekpo, doing business as FEMA Group, ("Iniekpo") brings this suit against Defendant Avstar International Corporation ("Avstar") for breach of contract and quantum meruit.[1] Iniekpo alleges in his Second Amended Complaint that in October 2006 he began negotiating with Sathiyagiri ("Giri") Valliappan of Avstar to provide maintenance and repairs on an airplane. Iniekpo alleges that Avstar did not pay him for all the work he performed. Avstar alleges that Iniekpo did not perform the work he claims was performed and is pursuing counterclaims for breach of contract, breach of express and implied warranties, and violations of the Texas Deceptive Trade Practices Act (DTPA).

All parties agreed to waive trial by a jury. The Court conducted a bench trial from July 19 through July 20, 2010. Pursuant to Fed. R. Civ. P. 52, the Court enters the following findings of fact and conclusions of law.

---

[1] The Court granted Defendant Giri Valliappan's motion for summary judgment on Plaintiff's claims against him so he is no longer a defendant. *See* Order on Mot. for Summ. J., Mar. 19, 2010 (Docket No. 71).

**FINDINGS OF FACT**

A.  Jurisdiction, Venue and Parties

1.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds a sum or value of $75,000 and the matter is between citizens of different States. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391.

2.  Plaintiff Francis Iniekpo, doing business as FEMA Group, is a citizen of Texas, residing in San Antonio. He possesses a bachelor's degree in aeronautic maintenance management and has some hours completed towards a master's degree in this field. He is licensed by the Federal Aviation Administration ("FAA") as an Airframe and Powerplant Mechanic, commonly referred to as an "A&P".

3.  Avstar International Corporation was a Florida corporation.[2] The company is owned by Giri Valliappan. Mr. Valliappan is the sole employee of the corporation, and he is a resident of Florida.

4.  All claims against Giri Valliappan in this case have been dismissed with prejudice.

B.  Background

1.  In June 2006, Giri Valliappan contacted Mr. Iniekpo about the possible purchase of a Boeing 737. Mr. Valliappan was attempting to secure this plane for an undisclosed "VIP." Mr. Valliappan reviewed the maintenance history of three aircraft and thereafter gave a letter of intent to purchase one Boeing 737. Messrs. Iniekpo and Valliappan thereafter had various conversations (by either telephone or email) about what work the plane would need to get the

---

[2] According to the Florida Secretary of State the corporation is currently inactive. Its place of business is Royal Palm Beach, Florida.

aircraft from San Antonio, Texas to Bucharest, Romania.

2. On or about October 5, 2006, Iniekpo sent Valliappan a quote to reactivate a Boeing 737-291 (tail number 992).  Plaintiff's Exhibit 2/Defendant's Exhibit 4.  The plane was formerly used by United Airlines and had not been flown for approximately six years.  The quote offered to reactivate the plane for a ferry flight (from San Antonio, Texas to Bucharest, Romania).  The quote states, in relevant part, as follows:

> 1. Reactivation for ferry flight - $20,000.00 (includes labor and routine parts)
>    a. Perform functional check of all aircraft systems.
>    b. Lube Gears, Flaps and Flt controls.
>    c. Perform Gear Swing.
>    d. Perform pitot/static check
>    e. Service Hydraulics and Oil
> 
> The above quote does not include major defect repairs or parts required. Repairs will be limited to airworthy items required for the intended flight.
> 
> 3. [sic] FEMA GROUP FEE           $5,000.00
> 4. Crew for Ferry Flight          $52,750.00 (includes fuel at current prices,
> (2ea crew members for 3days)      return airfare, Landing and Navigation Fees)

3. The quote also included a proposal to provide certain upgrades and modifications to the plane.  Giri Valliappan verbally rejected the proposal to provide upgrades and modifications.

4. The quote dated October 5, 2006 was never signed by any representative of Avstar International Corporation.

5. There is no written contract between Avstar and Iniekpo.

6. There was a verbal agreement between Avstar and Iniekpo for the performance of certain inspections, and maintenance on the aircraft.  In addition, the verbal agreement provided that Iniekpo would obtain a "ferry permit" and arrange for a qualified flight crew to fly the plane to Romania.  Mr. Valliappan testified that he and Mr. Iniekpo agreed that a complete

functional check of the aircraft would be done, including a pitot static check, gear swing and "B" check.

7. Iniekpo represented to Avstar that he was qualified to perform each of the necessary inspection and maintenance tasks called for by the verbal agreement.

8. 14 C.F.R. § 65.81(a) states in part as follows: "A certificated mechanic may perform or supervise the maintenance, preventive maintenance or alteration of an aircraft ... , for which he is rated ..., and may perform additional duties in accordance with §§ 65.85, 65.87, and 65.95. However, he may not supervise the maintenance, preventive maintenance, or alteration of, or approve and return to service, any aircraft or appliance, or part thereof, for which he is rated unless he has satisfactorily performed the work concerned at an earlier date. If he has not so performed that work at an earlier date, he may show his ability to do it by performing it to the satisfaction of the Administrator or under the direct supervision of a certificated and appropriately rated mechanic, or a certificated repairman, who has had previous experience in the specific operation concerned."

9. 14 C.F.R. § 65.83 states: "A certificated mechanic may not exercise the privileges of his certificate and rating unless, within the preceding 24 months--

(a) The Administrator has found that he is able to do that work; or

(b) He has, for at least 6 months--

(1) Served as a mechanic under his certificate and rating;

(2) Technically supervised other mechanics;

(3) Supervised, in an executive capacity, the maintenance or alteration of aircraft; or

(4) Been engaged in any combination of paragraph (b)(1), (2), or (3) of this section."

10. Although Defendant questions whether Iniekpo had worked on certain equipment found on a Boeing 737 within 24 months of December 2006, Iniekpo testified that he met the requirements of section 65.83. Avstar provided no competent evidence to the contrary.

11. Mr. Iniekpo does not possess an inspection authorization pursuant to 14 C.F.R. § 65.91. The Court, however, was not presented with any evidence that such an authorization was needed to perform the work Mr. Iniekpo did on this project. Apparently, the representative of the FAA, Ralph H. Rodriguez, did not request or require such an authorization prior to awarding the Special Airworthiness Certificate.

12. During the month of December 2006, Iniekpo and other individuals retained by him inspected and repaired the aircraft.

13. 14 C.F.R. § 43.9(a) provides in relevant part that "each person who maintains, performs preventive maintenance, rebuilds, or alters an aircraft ... shall make an entry in the maintenance record of that equipment containing the following information:

(1) A description (or reference to data acceptable to the Administrator) of work performed.

(2) The date of completion of the work performed.

(3) The name of the person performing the work if other than the person specified in paragraph (a)(4) of this section.

(4) If the work performed on the aircraft ... has been performed satisfactorily, the signature, certificate number, and kind of certificate held by the person approving the work. The signature constitutes the approval for return to service only for the work performed."

14. Plaintiff's Pre-Ferry Flight Inspection records (Plaintiff's Exhibit 4) failed to comply with 14 C.F.R § 43.9. Plaintiff's records failed to comply with section 43.9(4). The records lacked

proper signatures, certificate numbers and a notation indicating the kind of certificate held.[3]

15. Iniekpo represented to Avstar that he had performed a "B" check on the Aircraft. The testimony presented at trial indicated that aviation companies have differing interpretations of what constitutes a "B" maintenance check. On occasions, what the representative of the FAA wants inspected constitutes the components of a "B" check.

16. One of the individuals assisting Iniekpo in the inspection and repair of the aircraft, Jade Swiger, testified that he would not have called what was performed on the aircraft a "B" check.

17. Defendant argues that to perform a "B" check, Iniekpo was required to review Boeing's 737 manual and comply with those instructions. Defendant did not offer any Boeing manual as evidence and presented no competent evidence as to what elements of that manual were allegedly not complied with by Iniekpo.

18. Mr. Swiger testified that he took the "working copy" of Plaintiff's Pre-Ferry Flight Inspection records (Defendant's Exhibit 13) and typed them into a new document (Defendant's Exhibit 19). The new document contains information that was not contained in the original document. For example, the notation "Perform Gear Swing" is located at the bottom of page one in the new document, but was not noted in the original. Although Avstar questions whether Iniekpo performed a gear swing test on the aircraft, Avstar only offers its subjective belief that a gear swing test was not performed. Plaintiff admits that he did not follow Boeing's procedures for performing a gear swing (he did not jack the entire aircraft off the

---

[3]The evidence in this case displayed a disturbing lack of substantive compliance with the federal regulations in this industry. For example, the maintenance logs kept by United Airlines personnel on this plane were sometimes as sketchy as those done by Iniekpo.

ground). He testified, however, that he jacked one wheel at a time and performed a gear swing test on all three wheels.[4] Plaintiff testified that the cockpit indications noted that the gears were down and locked. Avstar does offer circumstantial evidence that a gear swing test was not performed. Iniekpo did not perform the test in a repair hanger, but rather on the transient parking ramp of the airport in the late evening hours.[5] Defendant, however, did not provide any evidence to indicate that the gear swing test could not have been performed as testified by Plaintiff. The plane did not encounter any gear swing problems on its flight to Romania.

19. Plaintiff testified that he was required to purchase a refurbished battery for the plane at a cost of $3,900 plus freight, and this would not be considered a "routine" part as contemplated by the verbal agreement. Defendant questions whether a battery was actually procured because of the lack of documentation to support its purchase and installation.[6] The Court finds that Iniekpo did procure a refurbished battery and that it was not a routine part. The plane's old battery was likely not useable after six years of inactivity. Plaintiff, however, only established

---

[4]Plaintiff testified that he borrowed the jacks from a local airport maintenance company, San Antonio Aerospace. Avstar argues, but failed to provide any competent evidence, that Iniekpo was a "persona non grata" at San Antonio Aerospace and accordingly could not have been able to borrow any jacks from them, thus supporting its argument that a gear swing test was not performed as represented.

[5]Avstar argues that performing maintenance in the transient ramp violates ordinances of the City of San Antonio. Defendant's Exhibit 17. Accordingly, Avstar argues that this is additional circumstantial evidence that the gear swing test was not performed by Iniekpo. Iniekpo testified that officials at the airport were aware of his maintenance activity and authorized his actions. Iniekpo further argues that he was paying rental to the City of San Antonio Airport for the ramp space.

[6]Iniekpo failed to keep "hard copies" of various business records. In addition, his computer crashed on various occasions and he apparently did not back up his hard drive. In addition, he often paid in cash for goods and services he obtained.

that the cost for the battery was $1,500.

20. Avstar agreed to reimburse Plaintiff for the rental space fee incurred at San Antonio International Airport. This was a request not contemplated by the verbal agreement. That fee totaled $1,680.

21. Avstar agreed to reimburse Plaintiff for the costs of towing the aircraft while at the San Antonio International Airport. This was a request not contemplated by the verbal agreement. That fee totaled $200.

22. Avstar requested that the plane be washed. This was a request not contemplated by the verbal agreement. Plaintiff incurred costs of $1,200 to wash the aircraft.

23. Avstar agreed to pay for a rendition of the aircraft. This was a request not contemplated by the verbal agreement. The parties dispute what the agreed upon price would be. Plaintiff charged $1,500 to do the rendition. Avstar argues that was not the agreed upon price, and it only agreed to pay $750. The Court finds that the agreed upon price was $1,500.

24. Plaintiff testified that he was required to purchase a refurbished vertical gyro for the plane at a cost of $2,589.40, and this would not be considered a "routine" part as contemplated by the verbal agreement. Defendant questions whether a vertical gyro was actually procured because of the lack of documentation to support its purchase and installation. The Court finds that Iniekpo did install a refurbished vertical gyro, however, Plaintiff has failed to establish by a preponderance of the evidence what sum of monies he expended in procuring this item.[7]

---

[7]The parties could interpret this finding as inconsistent. Accordingly, the Court offers this explanation. Plaintiff could have procured and installed this part (as he testified to), but failed to keep a receipt for this part. As noted later, Plaintiff did tender a receipt to Avstar, but the supplier testified

25. Plaintiff testified that he was required to purchase a radar receiver transmitter for the plane at a cost of $4,386.70, and this would not be considered a "routine" part as contemplated by the verbal agreement. Defendant questions whether a radar receiver transmitter was actually procured because of the lack of documentation to support its purchase and installation. The Court finds that Iniekpo did install a radar receiver transmitter, however, Plaintiff has failed to establish by a preponderance of the evidence what sum of monies he expended in procuring this item.[8]

26. Plaintiff testified that after all the maintenance repairs were done, he retained Phil Mezzler to "taxi" the aircraft from its location on the San Antonio airport to a repair hanger area and ran the plane's engines to insure that the airplane could develop enough thrust to take off. Plaintiff testified that the airplane "passed" the "power up" test.

27. On December 20, 2006, the parties attempted to secure permission from the Federal Aviation Administration (FAA) to allow the aircraft to depart to Romania. Ralph H. Rodriguez, the FAA representative[9], however, would not issue a Special Airworthiness Certificate (also known as a "ferry permit") because the aircraft had not been properly registered to Avstar, the new owner.

28. Plaintiff retained a flight crew to fly the plane to Romania before he was certain that the plane

---

that it was not a true receipt from his business. Although that is circumstantial evidence that the Plaintiff did not procure and install the part, it is also possible that Plaintiff did procure and install the part, but falsely created a receipt.

[8] *See supra* note 7.

[9] Mr. Rodriguez is not actually an employee of the FAA. He is an independent contractor licensed by the FAA to issue these certificates. Mr. Rodriguez is paid by the owner of the aircraft who wants the certificate issued.

was properly registered and before he obtained a Special Airworthiness Certificate. Plaintiff incurred costs of $13,897[10] in retaining the flight crew and dismissing them once he became aware that they would not be able to fly the plane out of San Antonio. The verbal agreement called for Avstar to pay Iniekpo $52,750 for the costs of ferrying the plane to Romania. The agreement contained a provision that this amount could increase if fuel costs increased. Plaintiff is responsible for prematurely retaining the flight crew on December 20. Defendant is not responsible under the verbal agreement for costs associated with the failed December 20 flight.

29. On December 30, 2006, a second attempt was made to secure the necessary Special Airworthiness Certificate. On that date, however, Ralph H. Rodriguez determined that Mr. Iniekpo was not properly licensed to perform a pitot system check. Accordingly, Mr. Rodriguez would not issue the Special Airworthiness Certificate. Plaintiff incurred costs of $13,897[11] in retaining this second flight crew and dismissing them once he became aware that they would not be able to fly the plane out of San Antonio. The verbal agreement called for Avstar to pay Iniekpo $52,750 for the costs of ferrying the plane to Romania. The agreement contained a provision that this amount could increase if fuel costs increased. Plaintiff is responsible for retaining the flight crew on December 29/30. Defendant is not responsible under the verbal agreement for costs associated with this failed flight.

30. Mr. Iniekpo attempted to retain a properly licensed individual from the San Antonio, Texas area to conduct the pitot system check, however, no one from the local area was available on

---

[10] Plaintiff's Exhibit No. 3 ($27,794 ÷ 2).

[11] Plaintiff's Exhibit No. 3 ($27,794 ÷ 2).

that date. Mr. Iniekpo notified Giri Valliappan of the problem and Valliappan retained the services of a Florida-based company (Miami Tech Line Maintenance) to travel to San Antonio to perform the pitot system check.[12]

31. On December 31, 2006, Miami Tech traveled to San Antonio and inspected the static system. They allegedly discovered a small leak on the A/T static system and made the necessary repairs.[13] Defendant's Exhibit 6.[14] With the inspection by this certified company, Mr. Rodriguez issued a Special Airworthiness Certificate.

32. Plaintiff testified that he did perform a static system check and found no leaks in the system. Avstar argues that the fact that Miami Tech did find a leak is circumstantial evidence that Plaintiff did not perform a static system check. Iniekpo counters that Miami Tech's equipment was the source of the leak. Avstar fails to establish by a preponderance of the evidence that Iniekpo did not perform a static system check. In the alternative, Defendant may not recover the $7,345 incurred in retaining Miami Tech. Plaintiff offered to cure this problem by retaining a certified San Antonio repair station to inspect the static system. Avstar insisted in retaining the Florida firm and as a result assumed the costs associated with travel by that company's personnel. The parties offered no breakdown between what were travel expenses and labor and repair expenses by Miami Tech.

33. Avstar argues that Plaintiff misrepresented that he was qualified to perform a pitot system

---

[12] Apparently, Valliappan desired that the plane arrive in Romania before January 1, 2007 because certain European Union (EU) rules would then become applicable to Romania.

[13] No one from Miami Tech actually testified at this trial.

[14] Avstar paid Miami Tech $7,345 to inspect the static system and travel costs to San Antonio.

check. Mr. Rodriguez did indeed require certified personnel to perform this test. Mr. Rodriguez testified that Plaintiff is "authorized to do just about any function on an aircraft or power plant ... – but he is prohibited to do some that are not listed by rule and the rule tells you which ones he cannot so there is a clear line that you can't cross." This is some evidence that Mr. Rodriguez found that Plaintiff was not qualified to perform a pitot system check. Defendant did not provide the Court with what rule Mr. Rodriguez was referring to. The Court takes judicial notice of 14 C.F.R. § 91.411. This section provides that "No person may operate an airplane ... unless ... each static pressure system, each altimeter instrument, and each automatic pressure altitude reporting system has been tested and inspected.... The tests required by paragraph (a) of this section must be conducted by - - (1) the manufacturer of the airplane...; (2) a certificated repair station ...: or (3) a certificated mechanic with an airframe rating (static pressure system tests and inspections only)." It is uncontested that Iniekpo does not possess a certificate to perform static pressure system tests.

34. On December 31, 2006, the aircraft left San Antonio, Texas. Less than two hours into the flight, however, the aircraft returned to San Antonio. The pilots encountered pressurization system problems and other issues with the aircraft. In addition, a crack in the windshield appeared during the flight. Defendant's Exhibit 14. Defendant appears to argue that the failure of this trip is circumstantial evidence that Iniekpo did not perform some of the tests described above. Plaintiff argues that he did perform all tests and that ground tests cannot replicate what pressure control problems will occur at certain flight altitudes.

35. Repairs were made to the aircraft. Defendant's Exhibits 7-9.[15]

36. On January 9, 2007, Mr. Rodriguez issued a second Special Airworthiness Certificate allowing the aircraft to "ferry" to Romania. The aircraft left San Antonio on that date and successfully landed in Bucharest, Romania.

37. Avstar verbally agreed to pay Iniekpo $20,000.00 for labor and routine parts, including but not limited to:

   a. Perform functional check of all aircraft systems

   b. Lube Gears, Flaps and Flt controls

   c. Perform Gear Swing

   d. Perform pitot/static check

   e. Service Hydraulics and Oil

38. Avstar agreed to pay Iniekpo a "group fee" of $5,000 to enable Iniekpo to pay for the wages of additional personnel needed to complete the project.

39. Iniekpo's invoice dated December 22, 2006 included one item that stated as follows: "Prepare aircraft for ferry flight.... Includes B-check, Gear Swing, Pitot static leak check...."

40. Avstar understood and agreed that the October 5, 2006 quote did not include major defect repairs or parts required. Iniekpo agreed to only repair certain defects (limited to airworthy items required for the intended flight).

---

[15]At its expense, Avstar obtained a replacement for the window assembly ($4,630), control assembly ($3,350) and vertical and directional gyro ($4,960). These items were not "routine" as contemplated by the verbal agreement and Plaintiff is not responsible for these costs.

41. The various invoices sent by Iniekpo indicate the following:

| Court Item No. | Invoice date | Description | Amount |
|---|---|---|---|
| 1 | 12/22/06 | Prepare aircraft ... and Group Fee | 25,000 |
| 2 | 12/22/06 | Aircraft rendition | 1,200 |
| 3 | 12/22/06 | Replace aircraft battery and freight | 4,070.63 |
| 4 | 12/22/06 | SAT airport space/ramp rental | 1,680 |
| 5 | 12/22/06 | Atow [sic] Aircraft to Rental Area | 200 |
| 6 | 12/22/06 | Replace #2 Vertical Gyro + freight | 2,589 |
| 7 | 12/22/06 | Replace Radar R/T + freight | 4,386 |
| 8 | 12/22/06 | Aircraft Wash | 1,200 |
| 9 | 12/22/06 | Ferry Aircraft from SAT to BBU (Includes Fuel, landing fees, Crew Rtn Fare & Hotel) | 64,970 |
| 10 | 12/22/06 | Crew Fare and Accommodation 12/20 and 12/29 | 27,794 |
| 11 | 1/10/07 | Airport Parking 9 days | 504 |
| 12 | 1/10/07 | Fema Group Additional Support 14 days @ $550/dy | 7,700 |
| 13 | 1/10/07 | Hotel Accommodation for 2 Techs | 233.48 |

42. With regard to Court Items number 1, Avstar agreed to the payment of this amount.

43. With regard to Court Item number 2, Avstar agreed to pay for a rendition of the aircraft. This was a request not contemplated by the verbal agreement. That fee totaled $1,200.

44. With regard to Court Item number 3, Iniekpo testified that he purchased the battery from Jet Engine Support. The owner of that business, Mike Gabriel, testified that Defendant's Exhibit 21 was not an invoice format that his company uses. Mr. Gabriel also testified that although he may have sold Iniekpo a battery, he doubted that he would have charged $3,900 as that amount is too high. The Court finds that Plaintiff expended $1,500 in procuring a battery.

45. With regard to Court Item number 4, Avstar agreed to reimburse Plaintiff for the rental space fee incurred at San Antonio International Airport. This was a request not contemplated by the verbal agreement. That fee totaled $1,680.

46. With regard to Court Item number 5, Avstar agreed to reimburse Plaintiff for the costs of towing the aircraft while at the San Antonio International Airport. This was a request not contemplated by the verbal agreement. That fee totaled $200.

47. With regard to Court Item numbers 6 and 7, Iniekpo testified that he purchased the gyro and radar from Jet Engine Support. The owner of that business, Mike Gabriel, testified that Defendant's Exhibits 22 and 23 were not invoices from his company and denied any recollection that he sold such equipment to Iniekpo. The Court finds that Plaintiff has not established what expenses he incurred in obtaining these parts.

48. With regard to Court Item number 8, Avstar requested that the plane be washed. This was a request not contemplated by the verbal agreement. Plaintiff incurred costs of $1,200 to wash the aircraft.

49. With regard to Court Item number 9, this item was an estimate of the costs that would be incurred in ferrying the flight to Romania. This is no evidence of what the actual costs of the trip were and does not supersede the verbal agreement that costs would total $52,750 (absent an increase in fuel prices).

50. With regard to Court Item numbers 10 and 11, these expenses do not supersede the verbal agreement that costs would total $52,750 (absent an increase in fuel prices).

51. With regard to Court Item numbers 12 and 13, Plaintiff included labor costs in his agreed upon $20,000 and $5,000 quote. These additional labor expenses incurred do not supersede the verbal agreement.

52. On April 2, 2007, Iniekpo sent another invoice with the alleged actual costs of the ferry trip. Also included were air fares for December 20, 22, 28, and 31, 2006. The total of the April

2, 2007 invoice was $98,622.60. Iniekpo did not provide underlying documents to substantiate these expenses. This is not evidence of what the actual costs of the trip were and does not supersede the verbal agreement that costs would total $52,750 (absent an increase in fuel prices).

53. The verbal agreement of the parties provided that Avstar would pay Iniekpo $52,750.00 for the flight crew expenses to Romania (including fuel at current prices, 2 crew members for 3 days, return airfare, landing and navigation fees). The parties agreed, however, that should fuel prices increase, the agreed price would be increased accordingly. Plaintiff failed to provide competent evidence to substantiate that fuel prices did increase from October 5, 2006 to January 9 and 10, 2007.

54. Under the verbal agreement, Avstar was obligated to pay Iniekpo $77,750.[16]

55. Apart from the verbal agreement, Iniekpo incurred expenses on behalf of Avstar totaling $4,280.[17]

56. Avstar has made the following payments to Iniekpo[18]:

```
12/1/06      5,000
12/11/06    15,000
12/18/06    52,750
12/29/06    10,000
            $82,750
```

## CONCLUSIONS OF LAW

---

[16] $25,000 + 52,750.

[17] $1,200 + 1,680 + 200 + 1,200.

[18] Defendant's Exhibit 13.

16

1. Any finding of act herein above which also constitutes a conclusion of law is adopted as a conclusion of law. Any conclusion of law herein made which also constitutes a finding of fact is hereby adopted as a finding of fact.

   Plaintiff's Breach of Contract Claim

2. To prove a claim for a breach of contract, the claiming party must establish (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained as a result of the breach. *Bank of Tex. v. VR Elec., Inc.*, 276 S.W.3d 671, 677 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). Avstar did not breach its verbal agreement with Plaintiff. It owed Plaintiff $77,750 and has fully paid that amount.

   Plaintiff's claim for Quantum Meruit

3. To recover under quantum meruit, a plaintiff must prove that "(1) valuable services and/or materials were furnished, (2) to the party sought to be charged, (3) which were accepted by the party sought to be charged, and (4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient." *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Plaintiff furnished services and/or materials to Avstar and Avstar agreed to reimburse Plaintiff for these expenses. Iniekpo incurred expenses on behalf of Avstar totaling $4,280. Avstar, however, has already paid Iniekpo $5,000.[19] Avstar has already paid all monies it may owe Plaintiff under a quantum meruit theory.

---

[19] Avstar owed Plaintiff $77,750 under the terms of the verbal agreement. It has, however, paid Iniekpo $82,750 leaving a credit of $5,000.

Defendant's Counterclaim for Breach of Contract

4. Iniekpo did not breach his verbal agreement with Avstar. Although Plaintiff was not licensed to perform a pitot/static check, he nevertheless performed one. In addition, he performed a functional check of all the aircraft's systems. Lubricated gears, performed a gear swing, and serviced the hydraulics systems.

Defendant's Counterclaim under the DTPA

5. To establish a DTPA claim, the claiming party must produce evidence that (1) it was a consumer; (2) that the defending party engaged in a false, misleading, or deceptive act or practice (3) that the claiming party detrimentally relied on the false, misleading, or deceptive act or practice; and (4) that the false, misleading, or deceptive act or practice was the producing cause of the injury. *B&W. Supply Co. v. Beckman*, 305 S.W.3d 10, 21 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also* TEX. BUS. & COM. CODE § 17.50(a)(1); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472 (Tex. 1995). Iniekpo engaged in a false, misleading, or deceptive act or practice. Iniekpo told Avstar that he was qualified to perform each of the necessary inspection and maintenance tasks called for by the verbal agreement. Iniekpo was not qualified to perform a pitot static check. Avstar relied on this representation in retaining Iniekpo. Damages in this case, however, are difficult to assess. Avstar argues that it is entitled to all of the monies it paid under the contract ($77,750) and the $7,345 it paid Miami Tech to inspect the static system. Mr. Valliappan's testimony on these issues, however, was not persuasive. He purchased the Boeing 737 virtually without seeing it. He did, however, review the maintenance records prior to the purchase. Although Mr. Valliappan testified that he would not have agreed to the plane being

refurbished on the airport tarmac and expected the repairs to take place in a hanger, he physically saw where the plane was being worked on. In addition, he was insisted on the plane being flown to Romania as quickly as possible. The Court finds that Avstar's "out of pocket" loss for this DTPA violation is $7,345.[20] A plaintiff is entitled to trebled economic damages for a DTPA claim if the defendant knowingly or intentionally violated the Act. Tex. Bus. & Com. Code § 17.50(b)(1); *see also Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006). Iniekpo knowingly or intentionally violated the Act.

Avstar's Counterclaim for Breach of Warranty

6. The elements of a claim for breach of warranty for services are (1) one party sold services to another; (2) the party made a representation to the other about the characteristics of the services by affirmation of fact, by promise, or by description; (3) the representation became part of the basis of the bargain; (4) the party breached the warranty; (5) the other party notified the party of the breach; and (6) the other party suffered injury. *Paragon Gen. Contractors, Inc. v. Larco Constr., Inc.*, 227 S.W.3d 876, 886 (Tex. App.—Dallas 2007, no pet.) (citing *Sw. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576-77 & n. 3 (Tex. 1991)). Avstar failed to establish by a preponderance of the evidence that Iniekpo breached any warranty.

7. Plaintiff shall take nothing on his claims. Defendant shall recover $7,345 in actual damages for violation of the DTPA and trebled damages for Iniekpo's knowing or intentional violation of the DTPA. In addition, Defendant shall recover its reasonable attorney's fees pursuant to

---

[20] Plaintiff failed to provide any evidence that the amount would have been less had he procured a certified San Antonio repair entity.

the DTPA. Defendant's motions for an award of attorney's fees shall be filed and served no later than 14 days after entry of judgment and shall comply with Local Rule CV-7. Costs shall be awarded to Avstar and a Bill of Costs in the form required by the Clerk of Court, together with supporting documentation, shall be filed within fourteen days of the Judgment. It is so ORDERED.

SIGNED this 26th day of July, 2010.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE